### IN THE UNITED STATES BANKRUPTCY COURT FOR THE
### EASTERN DISTRICT OF TENNESSEE

In re

Case No.  08-34321

SHAFI JAMAL KEISLER
KELLY LYNNE DICKENS

                              Debtors

          SHAFI JAMAL KEISLER
          KELLY LYNNE DICKENS

                    Plaintiffs/Counter-Defendants

          v.                                    Adv. No.  09-3076

MISSION COMPOUND, LLC,
COURMONT & WAPNER ASSOCIATES, LLC,
DR. R. GLENN HALL, JAMES HALL,
JOHN BRACKEN, JORDAN and SHEILA GLAZOV,
THE KENNETH & ELLEN NIBALI TRUST, and
FUNDACION GALVEZ

                    Defendants/Counter-Plaintiffs

CLIFFORD JOHNSON, DONALD TARR,
EDWARD DRUMMOND, GEORGE KERSHAW,
JOE BROWNLEE, JR., JOHN KERR,
PHILLIP YOUNG, and TOM RAYMOND

                    Defendants


### M E M O R A N D U M


**APPEARANCES:**    JENKINS & JENKINS ATTYS., PLLC
                    Michael H. Fitzpatrick, Esq.
                    2121 First Tennessee Plaza
                    800 South Gay Street
                    Knoxville, Tennessee  37929-2121
                    Attorneys for Debtors-in-Possession

JAMES KELLY GIFFEN, ESQ.
9724 Kingston Pike
Suite 702
Knoxville, Tennessee  37922-6914
Attorney for Mission Compound, LLC, Courmont & Wapner Associates, Dr.
R. Glenn Hall, James Hall, John Bracken, Jordan and Sheila Glazov, The
Kenneth and Ellen Nibali Trust, and Fundacion Galvez

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint filed by the Plaintiffs on June 5, 2009, to which eight Defendants, Mission Compound, LLC, Courmont & Wapner Associates, Dr. R. Glenn Hall, Fundacion Galvez, James Hall, John Bracken, Jordan and Sheila Glazov, and the Kenneth & Ellen Nibali Trust, filed an Answer and Counterclaim on July 3, 2009. The remaining eight Defendants, Clifford Johnson, Donald Tarr, Edward Drummond, George Kershaw, Joe Brownlee, Jr., John Kerr, Phillip Young, and Tom Raymond, have not appeared and a separate Entry of Default was entered against each of them on August 3, 2009, and pursuant to the original Pretrial Order entered on October 21, 2009, their rights were to be determined at the present trial.[1]  The trial was held on September 20 through September 23, 2010.

The record before the court consists of the Joint Stipulation of Facts and Documents For the September 20, 2010 Trial filed by the Plaintiffs and Defendants/Counter Plaintiffs on September 6, 2010, two hundred sixty-one (261) exhibits introduced into evidence including the deposition testimony of Edward Saviano, Esq., and James Ludlam, Esq., and the testimony of twelve witnesses: John Bracken, Gary Richard Lownsdale, Kenneth P. Nibali, Scott Adam Goldman, Justin Martin, Dr. Robert Glenn Hall, Deborah Overhall, Susheel Kurien, James Hall, Jordan E. Glazov, Kelly Dickens, and Shafi Jamal Keisler.  Pursuant to the Amended Pretrial Order entered September 15, 2010, the issues before the court are (1)  the amount of each of the Defendants/Counter-Plaintiffs' claim; and (2)  whether each of the fifteen Defendants, other than Mission Compound, LLC, has a

---

[1] The eight Defendants who have appeared and participated in the trial of this adversary proceeding will be referred to in this Memorandum as the Defendants/Counter-Plaintiffs.  The eight Defendants who have been defaulted will be referred to as the Defaulted Defendants.  All sixteen Defendants will be referred to collectively as the Defendants. The Plaintiffs/Counter-Defendants will be referred to simply as the Plaintiffs.

security interest in Kelly Dickens' ownership interest in Keisler Engineering, Inc.[2] All remaining issues, including the valuation of the Keisler Engineering stock, were reserved for a future hearing.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K), and (O) (2006).

I

The Plaintiff, Shafi Keisler, incorporated Keisler Engineering, Inc. (Keisler Engineering) on December 22, 2003, and has served as President and Chief Executive Officer since its inception. On that same date, Keisler Engineering issued a single stock certificate, in the amount of 100 shares, jointly to the Plaintiffs, Shafi Jamal Keisler and his wife, Kelly Dickens. TRIAL EX. 1. From January 1, 2004, the majority of Keisler Engineering's business has been the modification and resale of after-market automobile engines and transmissions.

In September 2005, Mr. Keisler learned of the closing of Manual Transmissions of Muncie, LLC, a General Motors/Chrysler joint venture manufacturing plant located in Muncie, Indiana, and the subsequent liquidation of its equipment through negotiated private sale and public auction by Maynards Industries (1991), Inc. (Maynards). On March 14, 2006, Keisler Engineering entered into a Bill of Sale and Agreement with Maynards to purchase a portion of the equipment for $5,629,900.00 with the intention of using the equipment to open a manual transmissions manufacturing facility in East Tennessee, paying a non-refundable deposit of $562,990.00 on

---

[2] The Amended Pretrial Order also listed as a determinable issue whether Sheila Glazov was a lender. The parties stipulated prior to trial that Ms. Glazov was not a lender and, therefore, is not a proper party to this adversary proceeding. Sheila Glazov will, accordingly, be dismissed.

March 15, 2006.  TRIAL EX. 6; TRIAL EX. 7; TRIAL EX. 9.  To facilitate this endeavor, Mr. Keisler

incorporated American Gear & Transmission, Inc. (American Gear & Transmission) on April 21,

2006, serving as its President and Chief Executive Officer, and on May 15, 2006, a stock certificate

for 1,000 shares was issued to Mr. Keisler, the sole shareholder.  TRIAL EX. 15.  Also on May 15,

2006, pursuant to an Assignment and Assumption Agreement, Keisler Engineering assigned its

interest in the Bill of Sale and Agreement to American Gear & Transmission.  TRIAL EX. 270.

The initial deadline for closing the sale of the equipment was April 17, 2006.  In order to

partially fund the purchase, Mr. Keisler received a commitment letter from BB&T to American Gear

& Transmission dated April 14, 2006, for a credit line of $3,450,000.00, with $3,000,000.00 to be

used to finance the equipment and $450,000.00 to pay back amounts advanced from Keisler

Engineering.  TRIAL EX. 266.  With respect to obtaining the remaining funds necessary to purchase

the equipment, Keisler Engineering and American Gear & Transmission entered into a consulting

agreement on April 13, 2006, with Jordan E. Glazov Consulting and an engagement agreement with

Marco Polo Securities, Inc., which was memorialized in an agreement dated April 14, 2006, each

to assist Keisler Engineering and American Gear & Transmission in the solicitation of financing

through subordinate lenders.  TRIAL EX. 224; TRIAL EX. 315.  To that end, Marco Polo Securities,

Inc., prepared and distributed to prospective lenders an Initial Capitalization Offering Executive

Summary.  TRIAL EX. 16.  Subordinate financing was not obtained.

Maynards extended the closing deadline several times, with the final deadline being May 16,

2006.  *See* TRIAL EX. 161; TRIAL EX. 162; TRIAL EX. 164; TRIAL EX. 165; TRIAL EX. 237; TRIAL EX.

176.  During this time and after realizing that he could not purchase the entire line of equipment, Mr.

5

Keisler renegotiated with Maynards to purchase a lesser amount of the equipment for $3,823,700.00.

*See* TRIAL EX. 237; TRIAL EX. 25.  On May 12, 2006, BB&T issued a final commitment letter to American Gear & Transmission for a $2,950,000.00 line of credit, designating $2,500,000.00 to be used in acquiring the equipment and $450,000.00 to be used to pay back amounts previously advanced from Keisler Engineering to American Gear & Transmission.  TRIAL EX. 268.  Thereafter, on May 15, 2006, BB&T and American Gear & Transmission entered into a Loan Agreement, and Mr. Keisler, as CEO and President of American Gear & Transmission, executed a Promissory Note in the amount of $2,950,000.00.  TRIAL EX. 18; TRIAL EX. 19.  As collateral for the loan and pursuant to a Security Agreement and a Pledge Agreement, both dated May 15, 2006, BB&T was granted a security interest in all of American Gear & Transmission's assets and received personal guaranties from the Plaintiffs.  TRIAL EX. 20 through TRIAL EX. 22.  Additionally, through the efforts of Marco Polo, Mr. Glazov, and Mr. Keisler, American Gear & Transmission received verbal commitments from Mission Compound, LLC (Mission Compound) and Courmont & Wapner Associates, LLC (Courmont & Wapner) for $500,000.00 each, and the following subordinate lenders subsequently agreed to loan the remaining funds:  $240,000.00 from John Bracken; $100,000.00 from Dr. R. Glenn Hall; $300,000.00 from James Hall; and $157,000.00 from Jordan Glazov.  Throughout the negotiations and finalization of the sub-lender financing, Mission Compound was represented by the law firm of Saviano, P.C., primarily through Edward Saviano and American Gear & Transmission was represented by the Atlanta, Georgia law firm of McKenna, Long & Aldridge, LLP (McKenna,

Long), primarily through Luis Aguilar and James Ludlam.  None of the other subordinate lenders, however, was represented by counsel during the lending negotiations.[3]

In order to meet the final deadline imposed by Maynards, the loans were negotiated and the corresponding documents were reviewed and revised between Friday, May 12, and Monday, May 15, 2006, through a number of emails between, among others, Mr. Keisler, Mr. Glazov, Mr. Saviano, and Mr. Aguilar.  *See, e.g.,* TRIAL EX. 168; TRIAL EX. 171; TRIAL EX. 173 through TRIAL EX. 175; TRIAL EX. 198; TRIAL EX. 200; TRIAL EX. 201; TRIAL EX. 203; TRIAL EX. 205; TRIAL EX. 294.  The closing of the BB&T financing occurred on May 15, 2006, and the closing for the subordinate financing occurred on May 16, 2006, each conducted by Justin Martin, at the offices of Kizer & Black in Maryville, Tennessee.  Both of the Plaintiffs but none of the Defendants/Counter-Plaintiffs subordinate lenders were present at the closing on May 16, 2006.

In association with the closing, Mr. Keisler, in his capacity as President of American Gear & Transmission, executed Promissory Notes, Security Agreements, and Note Agreements on May 15 and 16, 2006, in favor of the Defendants/Counter-Plaintiffs, Mission Compound, LLC, Courmont & Wapner Associates, James Hall, Glenn R. Hall and Robert Glenn Hall,[4] John Bracken, and Jordan Glazov.  These six Note Agreements, which were also executed by Keisler Engineering and by both of the Plaintiffs, individually, as "Pledgers," provide in material part:

---

[3] Dr. Hall testified that his attorney, Michael O'Mara, was brought in on Monday morning, May 15, to ensure the loan documents were executed before any money was released.  Similarly, Mr. Hall also used Mr. O'Mara, instructing him to "see that it was done right."  However, Mr. O'Mara was not involved in any of the negotiations for the subordinate lending.

[4] The parties have stipulated that the correct spelling for Dr. Hall is R. Glenn Hall and, as stated in Trial Exhibit 62, discussed *infra*, Robert Hall, Jr., was not a subordinate lender.

WHEREAS, the Pledgers, Engineering, and/or AGT desire to borrow up to $3,000,000 (the "Secondary Financing") for Engineering, AGT or any other entity owned or controlled by the Pledgers to complete the acquisition (the "Acquisition") of equipment that is used to manufacture manual automobile, truck and motor vehicle transmissions from Manual Transmissions of Muncie, LLC (a unit of General Motors) which equipment has subject to an appraisal by Maynards Industries pursuant to an appraisal dated March 7, 2006 . . .; and

WHEREAS, the Pledgers, Engineering, and/or AGT have the funds to complete such purchase with the Secondary Financing, except for the funds to be borrowed from Branch Banking & Trust Co. ("BBT") pursuant to a commitment letter (the "Commitment Letter") issued by BBT dated May 12, 2006 . . .; and

. . . .

WHEREAS, Engineering is not the debtor, but will also pledge its assets as security for the repayment of the amount to be borrowed hereunder with a secured interest on its assets to the extent those assets are not transferred to AGT, which security interests will only be subordinate to the security interest of BBT for the amount BBT is loaning the debtor to complete the Acquisition; and

WHEREAS, the Pledgers will guarantee the repayment of the amount borrowed hereunder and will secure their guarantee with a security interest in all their shares in the Owner as defined below, which security interest will be a senior security interest representing a first lien on such shares, with priority to any and all other security interest or other liens on such shares except such liens that may be pari passu with liens for the amounts of Secondary Financings not loaned by the Lender; and

WHEREAS, the Lender is willing to loan up to $_____[5] of the Secondary Financings, but only on the terms and conditions herein provided;

NOW THEREFORE, in consideration of the promises and the covenants hereinafter contained, the parties agree as follows:

1. <u>LOAN</u>.

The Lender will loan (the "Loan") $_____ to the person to whom BBT makes its loan under the Commitment Letter (the "Borrower") whereupon the Borrower will promptly complete the Acquisition and become the owner and operator of the equipment acquired thereunder.  The Loan shall bear interest at the

---

[5] This figure is different in each Note Agreement due to the varied amounts advanced by the respective Defendants/Counter-Plaintiffs.

rate of Sixteen Percent (16%), which interest shall be payable monthly as it accrues. Unless sooner provided under the Note or Security Agreement, the Loan shall be due and payable one year from the date of the signing of the Loan. . . .

Engineering, AGT and the Pledgers each agree that the Borrower shall be AGT, or such other entity as may be required by BBT to receive the loan made pursuant to the Commitment Letter who is acceptable to the Lender, and that the said Borrower shall enter into a written promissory note (the "Note") for the Loan to be made hereunder in the form attached hereto as Exhibit 1.

Engineering, AGT and the Pledgers also agree that the Borrower shall enter into the Security Agreement attached hereto, which security agreement shall grant a security interest over all the assets of the Borrower, subordinate only to the security interest of BBT for the amount loaned to the Borrower pursuant to the Commitment Letter.  The Security Agreement shall grant the Lender all the rights, privileges and protections (including covenants) with respect to the collateral (or the taking or sale thereof) as BBT has under its security agreement, except only that the Lender's lien shall be subordinate to BBT's and shall be pari passu with the liens of the other subordinated lenders, the other lenders of the Secondary Financing hereinafter called the "Other Subordinated Lenders." . . . In the event that the debt secured by BBT's security interest is paid in full or expires or ends, the Lender's security interest shall become the first lien on this collateral (pari passu with the liens of the Other Subordinated Lenders), [and] that any and all rights, privileges, and protections (including covenants) that BBT had under its security agreement shall be added to or become rights, privileges and protections the Lender has under its security agreement or this Agreement.  The Borrower shall promptly execute and deliver any and all documents reasonably requested by the Lender, in such form as Lender's counsel shall reasonably request, to evidence such rights, privileges and protections and all the costs and expenses incurred to draft such documents shall be paid by the Borrower.

The parties agree that Mission Compound, LLC will be the lead lender of all the Secondary Financing and that Mission Compound, LLC shall have the first right to assert the rights of all the persons making loans of the Secondary Financing (i.e., the Lender and the Other Subordinated Lenders) under the Security Agreements signed for the Secondary Financing regarding the security and the sale thereof.

The Pledgers also hereby agree to guarantee payment of the Note and grant a security interest and lien in all their shares of stock in the Borrower and in Engineering and AGT (if either one or both of them are not the Borrower), which security interest and lien shall be a first lien on that collateral, granting to Lender the same rights, privileges and protections that BBT was given under its security agreement on the Borrower's assets and shall be in the form as Lender's attorney

9

shall reasonably require.  The Pledgers acknowledge that they will have to give physical possession of this collateral to the Lender, which the Lender shall hold in escrow pursuant to the Security Agreement so that the Lender's security interest in the collateral is perfected.  The guarantee of the Pledgers shall be joint and several with them and the Borrower.  This guarantee shall be in such form as form as [sic] Lender's attorney shall require.

The parties hereto agree that the Lender's obligations hereunder to make the Loan are conditioned upon the delivery of the Security Agreements and Guarantees required to be issued to it hereunder.

. . . .

3.  <u>CLOSING</u>.

The Lender shall make the Loan only after all the conditions for Lender closing on the Loan to borrower set forth herein are satisfied in full and the Borrower, Pledgers, Engineering and AGT have duly executed the Note, Security Agreement and Guarantees required hereunder, BBT has closed on the loan under the Commitment Letter, the Pledgers have delivered their collateral (or signed an undertaking in form satisfactory to the Lender to do the same) under the security agreement they made securing their guarantee. . . . At or prior to the Closing, the Borrower and other parties hereto will execute and deliver the Note, the Security Agreement or other agreements required of them hereunder.  All documents and other instruments required to be delivered at the Closing shall be regarded as having been delivered simultaneously, and no document or instrument shall be regarded as having been delivered until all have been delivered.

4.  <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>.

(a)  <u>The parties hereto other than the Lender</u>.  Engineering, AGT and the Pledgers each represent and warrant to the Lender the following:

. . . .

2.  That they have all the power and authority to make and enter into this Agreement and the Related Agreements (as well as any other agreement or document required of them by the Lender to receive the Loan pursuant to the authority and power granted to the Lender under the Agreement or Related Agreements) and to perform their obligations hereunder.  That this Agreement constitutes their valid and legally binding obligation, enforceable in accordance with its terms and conditions, subject to debtor-creditor laws and other equitable remedies.  That they need not give any notice to, make any filing with, or obtain any authorization, consent, or approval

of any government or governmental agency or third party in order to consummate the transactions contemplated by this Agreement or any of the Related Agreements.

. . . .

5.  REPRESENTATIONS AND WARRANTIES OF LENDER.

The Lender represents and warrants to the Borrower the following:

. . . .

(c) That the Lender recognizes that investing in the Borrower and/or making the Note (or acquiring the Common Stock) is a speculative and involves a high degree or risk, and the Lender has taken full cognizance of and understands the risks related to the making of the Loan.

. . . .

(e) That the Lender is acquiring the Note for the Lender's own account for investment and not with a view to, or resale in connection with, any distribution of the Note, within the meaning of the Securities Act, and the Lender has no present intention of reselling, assigning or otherwise disposing of the Note or the Option herein granted.

6.  MISCELLANEOUS.

(a)  **Entire Agreement**.  This Agreement (and the Note and security agreements and guarantees to or for Lender) constitute the entire agreement among the parties with respect to the subject matter hereof and may not be amended or supplemented except by a writing signed by each of the parties hereto.

(b)  Survival of Warranties.  The warranties, representations, and covenants of the parties hereto, whether contained in this Agreement or any Related Agreements, shall survive the execution and delivery of this Agreement and the Closing but shall expire on the third anniversary of the date of the Closing (or, if later, the making of the Related Agreement).

. . . .

(d)  **Governing Law**.  This Agreement shall be construed in accordance with and governed by the laws of the state of New York . . . [.]

. . . .

11

(f) **Interpretation**.    The parties agree that this Agreement and any Related Agreement shall be construed without regard to or aid of any presumption, rule or canon requiring construction against the party (or its counsel) drafting the Agreement, each party hereby being deemed to have jointly drafted it.   Each party expressly waives any right to claim the contrary.    And, in the event of any inconsistency between this Agreement and any Related Agreement (including the Note), this Agreement shall control.

. . . .

(o) **Lender's Legal Remedies**.   The Lender shall have the right to enforce any provision of this Agreement . . . and or any Related Agreement at law or in equity, including the right to injunctive relief and specific performance.   Any and all remedies available to the Lender shall be cumulative, meaning that each available remedy shall be in addition to and not in lieu of any other remedy.

(p) **Legal Representation**.   This Agreement has been submitted to the parties for their scrutiny prior to execution and each party represents and warrants to the other that this document was reviewed by its independent legal counsel of its own choice before executing it and that it has the knowledge, experience, sophistication and business acumen to review and analyze this Agreement on its own.

. . . .

TRIAL EX. 27; TRIAL EX. 34; TRIAL EX. 39; TRIAL EX. 44; TRIAL EX. 49; TRIAL EX. 54.

Additionally, for each of these six loans, the Plaintiffs jointly executed a personal Guaranty

with the following covenants:

WHEREAS, the Guarantors [SHAFI KEISLER and KELLY DICKENS], Keisler Engineering, Inc., a Tennessee corporation ("Engineering"), and American Gear & Transmission, Inc., a Delaware corporation affiliated with Engineering ("AGT") on or about the date hereof entered into a Note Agreement (the "Note Agreement") with COURMONT & WAPNER ASSOCIATES ("Courmont"), a partnership mandated by the State of New York;[6] and

---

[6] The court has used the Guaranty executed in favor of Courmont & Wapner as the exemplar, but each Guaranty reads the same with the exception of the name and the amount loaned.

12

WHEREAS, pursuant to the Note Agreement Courmont is to loan $500,000 to AGT on the terms and conditions provided in the Note Agreement, which loan (the "Loan") is to be evidenced by a written promissory note (the "Note"); and

WHEREAS, the Guarantors are officers, directors, principals and/or shareholders of each of Engineering and AGT and want AGT to enter into the Note; and

WHEREAS, each Guarantor wants Courmont to make the Loan and will benefit from Courmont making the Loan, and as a specific and material inducement to making that Loan, and each Guarantor knowing that Courmont would not enter into the Note Agreement and make the Loan without, *inter alia*, the execution and delivery of this Guaranty;

NOW, THEREFORE, in consideration of Courmont entering into the Note Agreement and making the Loan evidenced by the Note, and for other good and valuable consideration the receipt and sufficiency of which are hereby conclusively acknowledged, each Guarantor, jointly and severally, hereby (1) guarantees to Courmont (and its successors and assigns) full payment of the principal and interest and any other amounts due and payable under the Note, (2) agrees that this Guaranty is absolute and unconditional, (3) waives all notice of non-payment, non-performance, non-observance or proof, or notice, or demand, whereby to charge the Guarantor therefor, (4) expressly agrees that the validity of this Guaranty and each Guarantor's obligations hereunder shall in no way be terminated, affected or impaired by reason of the assertion by Courmont of any of the rights or remedies reserved by Courmont pursuant to the terms of the Note Agreement or the Note (whether against Engineering, Shafi or Kelly or other parties to the Note Agreement), and (5) further covenants and agrees that this Guaranty shall remain and continue in full force and effect as to any amendment, renewal or change in the Note or the Note Agreements or any of the Related Agreements as that is defined in the Note Agreement. Furthermore, no Guarantor's obligations hereunder shall be released or effected by the bankruptcy of AGT or the other Guarantor, or by any agreement made by AGT or any one or both of the Guarantors regarding the Guarantor's liability under this Guaranty or AGT's liability under the Note.

TRIAL EX. 36; *see also* TRIAL EX. 29; TRIAL EX. 41; TRIAL EX. 46; TRIAL EX. 51; TRIAL EX. 56.

Finally, for each of the six initial Defendant/Counter-Plaintiff lenders, Mr. Keisler, individually, also executed a Security Agreement which provides, in material part:

13

### 1. Note and Guarantee

On the date hereof, Debtor has signed a guarantee (hereinafter the "Guaranty") guaranteeing to the Lender repayment of a promissory note (the "Note") made the date hereof in the principal amount of Five Hundred Thousand ($500,000.00) Dollars, with interest as described in the Note, for a loan (the "Loan") made by the Lender to American Gear & Transmission, Inc., a Delaware corporation ("AGT").

### 2. Statement of Ownership

Debtor is a principal shareholder of AGT and its affiliate Keisler Engineering, Inc. ("Engineering"), each of whom are engaged in the business of the manufacture, sale and distributions of manual automobile, truck and motor vehicle transmissions (Engineering and AGT are each collectively and individually called the "Companies"). AGT and Engineering each have only one class of stock, voting common stock. Debtor owns 1,000 shares of AGT common stock representing One Hundred (100%) percent of the issued and outstanding stock of AGT, and Debtor owns 100 shares of Engineering common stock representing One Hundred (100%) percent of the issued and outstanding stock of Engineering (all the Debtor's shares of AGT common stock and Engineering common stock, including shares received as a result of any stock dividends, stock splits or reorganizations, are individually and collectively called the "Shares"). Debtor guaranteed a repayment of AGT's Note to Lender to induce Lender to make the Loan evidenced by the Note. The Debtor has also granted security interests that are pari passu and equal in priority to the security interest given by Debtor to _____ [7] (which other security interest holders are collectively called herein the "Other Senior Lenders").

---

[7] The Mission Compound Security Agreement states "See Attached Schedule," which Schedule lists as the sub-debt holders John Bracken for $240,000.00, Jordan Glazov for $150,000.00, Glenn Hall for $100,000.00, James Hall for $300,000.00, Mission Compound for $500,000.00, Courant [sic] and Wapner for $500,000.00, Shafi Keisler for $140,000.00, and Marco Polo Securities for $121,000.00. TRIAL EX. 31. This section of the Courmont & Wapner Security Agreement is blank, and there is no schedule attached. TRIAL EX. 38. The remaining security agreements list John Bracken, Jordan E. Glazov and Sheila Glazov, Dr. Glen R. Hall and Robert Glen Hall, Jr., James Hall, Mission Compound LLC, Courmont & Wapner Associates LLC, Richard P. Diegnan and Richard P. Diegnan, Jr., and Marco Polo Securities, Inc. in paragraph 2. TRIAL EX. 43; TRIAL EX. 48; TRIAL EX. 53; TRIAL EX. 58. The inconsistencies concerning the subordinate lenders were resolved by the following paragraph contained in the Side Letter Agreement Relating to Subordinated Loans to American Gear & Transmission, Inc. dated September 1, 2006, from American Gear & Transmission to each of the original lenders:

> The names, amounts and notice addresses for each of the other lenders which have made subordinated debt loans (the "Sub-Debt Lenders") to AGT and which are *pari passu* to Lender are attached to this letter as Schedule A.

TRIAL EX. 62 at ¶13; TRIAL EX. 63 at ¶11; TRIAL EX. 64 at ¶10; TRIAL EX. 65 at ¶10; TRIAL EX. 66 at ¶10; TRIAL EX. 67 at ¶10. Schedule A attached to each of the foregoing lists Mission Compound, James Hall, Dr. Glenn R. Hall, John Bracken, Jordan E. Glazov, Courmont & Wapner, and Marco Polo Securities, Inc. TRIAL EX. 62 through TRIAL EX. 67.

3.  Security Interest

As security for Debtor's satisfaction of its obligations under the Guarantee and Note, Debtor hereby grants Lender a security interest in the Shares (hereinafter the Shares and all proceeds of whatever type from any sale, exchange or other dispositions of said Shares are collectively hereinafter referred to as the "Security"). Lender's security interest in the Security will end, and only end, when all the Debtor's obligations under the Guarantee and Note are satisfied in full.

. . . .

4.  Liens and Claims of Others

Debtor represents and warrants to Lender that he has good and marketable title to the Shares, free and clear of any and all liens and encumbrances and that no one besides Debtor owns or has any interest in or any claim against the Security. Debtor further represents and warrants to Lender that Debtor will not assign, transfer, pledge, hypothecate or otherwise encumber any of the Security and that he will not grant any proxy in, on or over the Shares, voting or otherwise, or make or enter into any voting trust or voting agreement with respect to the Shares.  Debtor shall at Debtor's sole cost and expense protect and defend the Security from any and all claims and shall keep the Security free and clear of any liens of any person other than Lender (and of pari passu liens of the Other Senior Lenders) or persons solely making claims to the Security through the Lender.

The parties agree that all persons who have a first lien on the Security have agreed (or will agree) that Mission Compound, LLC will be the lead lender of all the persons providing Secondary Financing and shall have the right to assert the rights of all the persons having a senior lien regarding the Security and the sale thereof.

. . . .

6.  Official Documents to Protect Lender's Security

Debtor will provide, at no cost to Lender, whatever signed documents Lender reasonably requests to establish or protect its security interest in the Security including but not by way of limitation, UCC forms and financing statements. . . . If

15

the Security consists of stock in any corporations, Debtor shall also deliver physical possession of such securities as may be required herein or by the Lender.

### 7.  Default

. . . .

Debtor will be in default:

. . . .

(d)  If Debtor gives another security interest in the Security or encumbers the Security without first paying all it owes to Lender under the Note, excepting the pari passu security interests granted to the Other Senior Lenders on or about the date hereof.

(e)  On the occurrence of a breach or default of any other obligation owed by Debtor, whether under this Security Agreement, or any other written agreement, now existing or hereinafter made by Debtor (and/or the Companies) with Lender or the Other Senior Lenders.

. . . .

### 10.  Distribution of Sale Proceeds

If Lender sells the Security, the proceeds shall be applied as follows:

First:  to the expenses of collecting, selling, and delivering the Security, including (but not limited to) attorneys' fees, brokerage commissions, transfer fees, and taxes;

Second:  to the payment of any amounts owed by Debtor with respect to the Security to the Lender and the Other Senior Lenders pari passu, pursuant to the terms hereof, including interest thereon, until the Note is paid in full; and

Third:  the surplus, if any will be paid to Debtor or as otherwise required by law.

. . . .

### 15.  Amendments

This Security Agreement, together with the Guaranty and Note Agreement to which they are a part, contains the full understanding between the parties hereto and may only be changed in writing as provided in said Note Agreement.

. . . .

### 23.  Escrow Agent

The Shares and stock power signed by Debtor pursuant to this Security Agreement shall be held in escrow by a person (the "Escrow Agent") who agrees to be bound by the terms of this Paragraph 24 by signing this Security Agreement in the space provided . . . [.]

The initial Escrow Agent shall be the Lender or any one of the other Subordinated Lenders acceptable to Lender. . . . The Lender may replace any Escrow Agent who is removed by him or who is no longer able or willing to act as Escrow Agent hereunder with any other person who agrees to act as Escrow Agent who is either (i) a duly licensed attorney authorized to conduct a legal practice anywhere in the U.S. selected by the Lender; (ii) an Other Senior Lender; or (iii) if not such an attorney or Other Senior Lender, a person acceptable to Debtor, Lender and the Other Senior Lenders. . . .

The Escrow Agent shall hold the Shares and stock power delivered to it in escrow upon the following terms:

a.  Upon receipt of a written notice from Lender (or Other Senior Lender) that Debtor is in default, the Escrow Agent shall send a notice thereof to Debtor and ten (10) days after the sending of said notice shall deliver the Shares and Stock Power to Lender and Other Senior Lenders pari passu, pursuant to the terms hereof.  The Escrow Agent shall not make this delivery if it receives from the Debtor within said ten (10) day period a written notice disputing such delivery prior to the making of the same.

. . . .

TRIAL EX. 31; TRIAL EX. 38; TRIAL EX. 43; TRIAL EX. 48; TRIAL EX. 53; TRIAL EX. 58.[8]  As

expressly set forth in paragraphs 2 and 4 of each Security Agreement and in Section 1 of each Note

---

[8] Each Security Agreement is virtually identical with the exception of the names and addresses of the individual lenders and the amounts of the promissory notes being secured.  One notable difference, however, is that the section 2. Statement of Ownership provision in all but the Mission Compound and Courmont & Wapner Security Agreements executed by Mr. Keisler erroneously recite that "Debtor [Shafi Keisler] owns 1000 shares of [Keisler] Engineering common stock."  TRIAL EX. 43; TRIAL EX. 48; TRIAL EX. 53; TRIAL EX. 58.

Agreement, it was agreed that each lender's security interest was pari passu and equal in priority with the others, and Mission Compound was designated among the Defendant/Counter-Plaintiff subordinate lenders as "lead lender."

As required by the Security Agreements, Mr. Keisler executed a blank Stock Power for the 1,000 shares of American Gear & Transmission stock and both of the Plaintiffs executed a blank stock power for the 100 shares of Keisler Engineering stock at the May 16, 2006 closing.  TRIAL EX. 60; TRIAL EX. 61.  Both Stock Powers, along with the respective stock certificates, were provided to Mr. Martin for delivery to Mr. Saviano, and on May 17, 2006, Mr. Saviano received the original stock powers and stock certificates via Federal Express from Mr. Martin, and these documents have remained in his possession continuously from that date.  *See* TRIAL EX. 214; TRIAL EX. 239; TRIAL EX. 265.  Also on May 17, 2006, Mr. Saviano, as attorney for Mission Compound, sent to Mr. Ludlam by email attachment a draft security agreement for execution by Ms. Dickens.  TRIAL EX. 215; *see also* TRIAL EX. 32 (copy executed by Mr. Kurien on behalf of Mission Compound).  The Security Agreement executed by Ms. Dickens dated May 16, 2006,[9] and which was received by Mr. Saviano on June 7, 2006, is practically identical to the Security Agreements executed by Mr. Keisler, providing in material part the following significant sections:

    1.  <u>Note and Guarantee</u>

On the date hereof, Debtor has signed a guarantee (hereinafter the "Guaranty") guaranteeing to the Lender repayment of a promissory note (the "Note") made the date hereof in the principal amount of Five Hundred Thousand ($500,000.00) Dollars, with interest as described in the Note, for a loan (the "Loan")

---

[9] The parties stipulated that the Security Agreement was not, however, executed by Ms. Dickens on May 16, 2006.

made by the Lender to American Gear & Transmission, Inc., a Delaware corporation ("AGT").

## 2. Statement of Ownership

Debtor is, jointly with her husband Shafi Keisler ("SK"), a shareholder [in] Keisler Engineering, Inc. ("Engineering"), an affiliate of AGT. Engineering and AGT is each engaged in the business of the manufacture, sale and distributions of manual automobile, truck and motor vehicle transmissions. Engineering has only one class of stock, voting common stock. Debtor, jointly with SK, owns 100 shares of Engineering common stock representing One Hundred (100%) percent of the issued and outstanding stock of Engineering (all the Debtor's shares of Engineering common stock, including shares received as a result of any stock dividends, stock splits or reorganizations, are individually and collectively called the "Shares"). Debtor guaranteed a repayment of AGT's Note to Lender to induce Lender to make the Loan evidenced by the Note. The Debtor has also granted security interests that are pari passu and equal in priority to the security interest given by Debtor to Lender hereunder to John [Bracken], Jordan E. Glazov and Sheila N. Glazov, James Hall, Dr. Glenn Hall and Robert Glen Hall, Courmont & Wapner Associates, LLC, Richard P. Diegnan and Richard P. Diegnan, Jr., and Marco Polo Securities, Inc. (which other security interest holders are collectively called herein the "Other Senior Lenders").

## 3. Security Interest

As security for Debtor's satisfaction of its obligations under the Guarantee and Note, Debtor hereby grants Lender a security interest in the Shares (hereinafter the Shares and all proceeds of whatever type from any sale, exchange or other dispositions of said Shares are collectively hereinafter referred to as the "Security"). Lender's security interest in the Security will end, and only end, when all the Debtor's obligations under the Guarantee and Note are satisfied in full.

. . . .

## 4. Liens and Claims of Others

Debtor represents and warrants to Lender that he has good and marketable title to the Shares, free and clear of any and all liens and encumbrances and that no one besides Debtor owns or has any interest in or any claim against the Security. Debtor further represents and warrants to Lender that Debtor will not assign, transfer, pledge, hypothecate or otherwise encumber any of the Security and that he will not grant any proxy in, on or over the Shares, voting or otherwise, or make or enter into any voting trust or voting agreement with respect to the Shares. Debtor shall at

19

Debtor's sole cost and expense protect and defend the Security from any and all claims and shall keep the Security free and clear of any liens of any person other than Lender (and of pari passu liens of the Other Senior Lenders) or persons solely making claims to the Security through the Lender.

The parties agree that all persons who have a first lien on the Security have agreed (or will agree) that Mission Compound, LLC will be the lead lender of all the persons providing Secondary Financing and shall have the right to assert the rights of all the persons having a senior lien regarding the Security and the sale thereof.

. . . .

6. <u>Official Documents to Protect Lender's Security</u>

Debtor will provide, at no cost to Lender, whatever signed documents Lender reasonably requests to establish or protect its security interest in the Security including but not by way of limitation, UCC forms and financing statements. . . . If the Security consists of stock in any corporations, Debtor shall also deliver physical possession of such securities as may be required herein or by the Lender.

7. <u>Default</u>

. . . .

Debtor will be in default:

. . . .

(d)  If Debtor gives another security interest in the Security or encumbers the Security without first paying all it owes to Lender under the Note, excepting the pari passu security interests granted to the Other Senior Lenders on or about the date hereof.

(e)  On the occurrence of a breach or default of any other obligation owed by Debtor, whether under this Security Agreement, or any other written agreement, now existing or hereinafter made by Debtor (and/or Engineering) with Lender or the Other Senior Lenders.

. . . .

10. <u>Distribution of Sale Proceeds</u>

If Lender sells the Security, the proceeds shall be applied as follows:

20

First:  to the expenses of collecting, selling, and delivering the Security, including (but not limited to) attorneys' fees, brokerage commissions, transfer fees, and taxes;

Second:  to the payment of any amounts owed by Debtor with respect to the Security to the Lender and the Other Senior Lenders pari passu, pursuant to the terms hereof, including interest thereon, until the Note is paid in full; and

Third:  the surplus, if any will be paid to Debtor or as otherwise required by law.

. . . .

15.  Amendments

This Security Agreement, together with the Guaranty and Note Agreement to which they are a part, contains the full understanding between the parties hereto and may only be changed in writing as provided in the said Note Agreement.

. . . .

21.  Cumulative Remedies

. . . .

(c)  Escrow Agent

The Shares and stock power signed by Debtor pursuant to this Security Agreement shall be held in escrow by a person (the "Escrow Agent") who agrees to be bound by the terms of this Paragraph 24 by signing this Security Agreement in the space provided . . . [.]

The initial Escrow Agent shall be the Lender or any one of the other Subordinated Lenders acceptable to Lender. . . . The Lender may replace any Escrow Agent who is removed by him or who is no longer able or willing to act as Escrow Agent hereunder with any other person who agrees to act as Escrow Agent who is either (i) a duly licensed attorney authorized to conduct a legal practice anywhere in the U.S. selected by the Lender; (ii) an Other Senior Lender; or (iii) if not such an attorney or Other Senior Lender, a person acceptable to Debtor, Lender and the Other Senior Lenders. . . .

21

The Escrow Agent shall hold the Shares and stock power delivered to it in escrow upon the following terms:

> (d)  Upon receipt of a written notice from Lender (or Other Senior Lender) that Debtor is in default, the Escrow Agent shall send a notice thereof to Debtor and ten (10) days after the sending of said notice shall deliver the Shares and Stock Power to Lender and Other Senior Lenders pari passu, pursuant to the terms hereof.  The Escrow Agent shall not make this delivery if it receives from the Debtor within said ten (10) day period a written notice disputing such delivery prior to the making of the same.

> . . . .

TRIAL EX. 33; *see also* TRIAL EX. 192 (forwarding the revised agreement executed by Ms. Dickens to Mr. Kurien for his signature).

On September 1, 2006, American Gear & Transmission sent to the initial six Defendant/Counter-Plaintiff lenders a Side Letter Agreement Relating to Subordinated Loans to American Gear & Transmission, Inc. (Side Letter Agreement) for the purpose of clarifying certain terms and clauses within the respective loan documents.  TRIAL EX. 62 through TRIAL EX. 67. Included within the clarifications, as relevant to the issues herein, are the following:

> 7.  In Paragraph 2 of the Keisler Security Agreement, Keisler owns 100 shares of Engineering common stock jointly with Dickens[.]

> 8.  (a).  In Section 6 of each of the Security Agreements, and as an additional provision to the Note Agreement, the Parties hereby agree and confirm that Lender, and Lender alone, is responsible for filing any UCC financing statements and/or taking any actions to perfect Lender's own security interest.  Lender shall not be responsible for filing any UCC financing statements for any other senior or subordinated lender with reference to this transaction.  AGT shall remain liable for costs in recording any documents related to perfecting Lender's security interest.

> (b).  In Paragraph 2 of the Keisler Security Agreement, "Shares" shall be defined to include all of Keisler's shares of stock in Engineering and/or AGT (whether owned individually or jointly with Dickens), now or hereinafter acquired, and all

22

replacements, accessions, additions to, substitutions for those Shares and all proceeds from the sale of any Shares.

. . . .

11.   The Parties hereby agree and confirm that AGT has received a total of $2,032,000.00 from Lender and other lenders as a result of the transaction reflected in the Loan Documents.   The Parties hereby agree and confirm that AGT may enter into additional Loan or Loans, Promissory Note or Notes, Note Agreement or Agreements and Security Agreements (identical in form to that with Lender) with other lenders up to an additional future cash amount of $2,500,000.00, which amount shall be considered additional subordinated debt and which loan and security granted thereto shall be *pari passu* to Lender and any other subordinated debt lenders. Lender approves and consents to such additional subordinated loan or loans and that AGT, Engineering, Keisler and Dickens may enter into any documents required under such.

12.   Each and any mention of Robert Hall, Jr. as a subordinated debt lender is hereby deleted.

13.   The names, amounts and notice addresses for each of the other lenders which have made subordinated debt loans (the "Sub-Debt Lenders") to AGT and which are *pari passu* to Lender are attached to this letter as Schedule A.

TRIAL EX. 62.[10]  Only the Mission Compound Side Letter Agreement, however, references a Security Agreement between the lender and Ms. Dickens.  TRIAL EX. 62.

As authorized by the Side Letter Agreements, American Gear & Transmission sought and obtained additional funding from the two remaining Defendants/Counter-Plaintiffs as follows: $200,000.00 from The Kenneth & Ellen Nibali Trust pursuant to a Note Agreement and Promissory Note dated September 22, 2006; and $100,000.00 from Fundacion Galvez pursuant to a Note

---

[10] The foregoing are cited from the Mission Compound Side Agreement entered into evidence as Trial Exhibit 62.  Although there are slight differences in the remaining letters, including paragraphs concerning a 5% Facility Fee related solely to Mission Compound and Courmont & Wapner Associates, correction of the mailing address for Mission Compound, and references to the Dickens Security Agreement and her ownership of stock in Keisler Engineering rather than AGT, the Side Letter Agreements with the remaining subordinate lenders are substantially the same as that with Mission Compound.  *See* TRIAL EX. 63 through TRIAL EX. 67.

Agreement and Promissory Note dated October 19, 2006. TRIAL EX. 68; TRIAL EX. 69; TRIAL EX. 73; TRIAL EX. 74. In association with these loans, Mr. Keisler executed two Security Agreements for each loan, the first on behalf of American Gear & Transmission and the second by himself individually, which were primarily identical to those executed for the first six Defendants/Counter-Plaintiffs but for the following relevant distinction in paragraph 2, Statement of Ownership in Mr. Keisler's Security Agreement, which states "Debtor, jointly with Kelly Dickens, owns 1000 shares of [Keisler] Engineering stock representing One Hundred percent (100%) of the issued and outstanding stock of Engineering." TRIAL EX. 72; TRIAL EX. 77;[11] see also TRIAL EX. 71; TRIAL EX. 76. Additionally, both of the Plaintiffs once again jointly executed a personal Guaranty to each of these Defendant/Counter-Plaintiff lenders. TRIAL EX. 70; TRIAL EX. 75. Thereafter, between January 25, 2007, and March 26, 2007, American Gear & Transmission obtained the following subordinate financing from the Default Defendants: (1) $100,000.00 from John Kerr; (2) $100,000.00 from Tom Raymond; (3) $100,000.00 from Donald F. Tarr; (4) $100,000.00 from Phillip S. Young; (5) $100,000.00 from George Kershaw; (6) $100,000.00 from Clifford Johnson; (7) $50,000.00 from Edward Drummond, Jr.; and (8) $50,000.00 from Joe Brownlee, Jr. For each of these loans, a Note Agreement, Promissory Note, Security Agreement from American Gear & Transmission, Security Agreement from Mr. Keisler, and personal Guaranty from both of the Plaintiffs was executed. TRIAL EX. 78 through TRIAL EX. 116; TRIAL EX. 141.[12]

---

[11] These Security Agreements erroneously state that there are 1000 shares of Keisler Engineering stock. *See supra* n.8.

[12] The Security Agreements signed by Mr. Keisler for each of these subordinate lenders reflect the joint ownership of the Keisler Engineering stock with Ms. Dickens and likewise reflect the erroneous reference to 1000 shares. *See supra* n. 8, 11.

On November 27, 2006, Mr. Keisler sent a letter concerning the decision to merge Keisler

Engineering with American Gear & Transmission separately addressed to Fundacion Galvez, Mr.

James Hall, and Dr. Glenn Hall, reading in material part as follows:

> I am sending this letter to inform you that we have made a decision we believe will
> benefit you as a note holder of American Gear and Transmission, Inc. ("AGT").
>
> In May of 2006 you entered into a Note Agreement, and related Security Agreements
> with AGT (collectively, the "Agreements"), and as you know we have been working
> towards the operational execution of AGT, including identification of plant site,
> equipment installation and filling the sales pipeline.
>
> We believe that it is in the best interest of both AGT and Keisler Engineering, Inc.
> ("Keisler") to effect a merger of Keisler into AGT.  The surviving company will be
> AGT.
>
> . . . .
>
> As you know, Keisler is owned by me and my wife, Kelly Dickens, and pursuant to
> the Note Agreement and related Security Agreements Kelly and I have executed in
> favor of the note holders, the Stock Certificate representing our shares in Keisler are
> being held in custody by Mission Compound, LLC, as the lead lender pursuant to
> Section 1 of the Note Agreement ("Lead Lender"), on behalf of all the note holders.
> Pursuant to those same Security Agreements, this Lead Lender is also holding in
> custody the Stock Certificates representing all the currently outstanding shares of
> AGT.
>
> . . . .
>
> Because of the effect on the Keisler shares held by the Lead Lender, and various
> provisions in the Agreements, I am seeking your consent as to this merger, the
> additional issuance of shares in common stock in AGT, and other actions described
> above.  If you're in agreement, please sign below and fax to my attention . . .[.]
>
> I appreciate your consideration and approval, and above all the vote of confidence
> given me by your note purchase.

TRIAL EX. 193 (evidencing Mr. Galvez's signature dated December 1, 2006); TRIAL EX. 276

(evidencing Mr. Hall's signature dated December 5, 2006); TRIAL EX. 277 (evidencing Dr. Hall's

signature dated December 1, 2006).  This same letter, which was subsequently sent to Jordan Glazov,

Mission Compound, and The Kenneth & Ellen Nibali Trust on December 6, 2006, was executed and

approved by Mr. Glazov on December 6, 2006, by Susheel Kurien on behalf of Mission Compound

on December 7, 2006, and by the Nibalies on December 6, 2006.  TRIAL EX. 236; TRIAL EX. 274;

TRIAL EX. 275.

The proposed merger between American Gear & Transmission and Keisler Engineering did

not materialize, and American Gear & Transmission never began manufacturing in East Tennessee.

After the company was no longer viable, a public auction of its remaining assets was conducted on

October 30, 2007, resulting in proceeds of $3,631,820.00, which was sufficient to pay the BB&T

loan in full and to make a pro rata payment to each of the Defendants.  TRIAL EX. 197.  In a letter

dated December 31, 2007, from Mr. Keisler as CEO of American Gear & Transmission, and

addressed to the "AGT Subordinated Lenders," *i.e.*, all sixteen Defendants in this adversary

proceeding, questions raised at a meeting held on December 21, 2007, were discussed and answered,

including the following which are material to this adversary proceeding:

> **How did the bulk of the AGT money get spent?**  $4 million was spent on
> equipment; $600K on rigging; $700K on interest, transaction and other fees; $140K
> on storage costs; $150K on legal fees; $80K on R&D; and the remainder was spent
> on overhead and project development costs.

> **Why are we not being paid our debt in full?**  It is important to remember that this
> is an AGT debt secured by a lien on the stock, but not the assets, of Keisler
> Engineering.  Keisler Engineering is attempting to amicably resolve this issue by
> assuming a large portion of the AGT debt; however, Keisler Engineering simply does
> not have the cash flow to assume the full amount of the debt.  Keisler Engineering
> has offered what it feels to be a fair compromise which both provides a significant
> return of the AGT investors' principal while allowing Keisler Engineering enough
> cash to operate.

26

. . . .

**What is the collateral for the loan, and how is Keisler Engineering involved?**
The AGT subordinated debt holders were issued the following: 1) an asset lien on
the AGT equipment; 2) a stock lien on the stock certificates of AGT and Keisler
Engineering; and 3) a personal guarantee from both my wife and myself. A lien on
the assets of Keisler Engineering was never offered or issued to the AGT
subordinated debt lenders.

. . . .

TRIAL EX. 195. American Gear & Transmission subsequently filed a Voluntary Petition under the

Bankruptcy Code on September 3, 2008, followed by the filing of the Plaintiffs' Voluntary Petition

commencing their individual bankruptcy case under Chapter 11 on September 29, 2008.

## II

As an initial matter, the issue concerning the amounts of the eight

Defendants/Counter-Plaintiffs' claims is easily resolved. At trial, the Plaintiffs stipulated the

Defendants/Counter-Plaintiffs' calculations of their respective claims, and therefore, each claim

amount as of September 29, 2008, the date the Plaintiffs commenced their Chapter 11 case, is as

follows:

| | |
|---|---|
| John Bracken | $279,480.75 |
| James Hall | $349,368.40 |
| Dr. R. Glenn Hall | $116,466.80 |
| Jordan E. Glazov | $182,661.49 |
| Courmont & Wapner Associates | $582,270.04 |
| Mission Compound | $582,270.04 |
| Kenneth and Ellen Nibali Trust | $232,892.16 |
| Fundacion Galvez | $116,466.80 |

COLL. TRIAL EX. 324A; *see also* TRIAL EX. 142 through TRIAL EX. 149; TRIAL EX. 151. With

respect to the remaining issue – whether any of the Defendants other than Mission Compound, LLC

27

has a security interest in Kelly Dickens' ownership interest in Keisler Engineering – the parties agree

that resolution is governed by Article 9 of the Uniform Commercial Code as adopted in New York.

Under Article 9, the term "security agreement" is defined primarily as "an agreement that

creates or provides for a security interest."  NY UCC § 9-102.  This definition is expounded upon

in the Official Comments, which state in material part:

> The definition of "security agreement" is substantially the same as under former
> Section 9-105 – an agreement that creates or provides for a security interest.
> However, the term frequently was used colloquially in former Article 9 to refer to the
> document or writing that contained a debtor's security agreement.  This Article
> eliminates that usage, reserving the term for the more precise meaning specified in
> the definition.
>
> Whether an agreement creates a security interest depends not on whether the parties
> intend that the law *characterize* the transaction as a security interest but rather on
> whether the transaction falls within the definition of "security interest" in Section
> 1-201. . . .

NY UCC § 9-102 cmt. 3.b.  As referenced and relevant herein, "security interest" under Section

1-201 of the Uniform Commercial Code is defined as "an interest in personal property or fixtures

which secures payment or performance of an obligation.  The term also includes any interest of a

consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a

transaction that is subject to Article 9. . . ."  NY UCC § 1-201(37).  Additionally, Article 1 defines

"agreement" as

> the bargain of the parties in fact as found in their language or by implication from
> other circumstances including course of dealing or usage of trade or course of
> performance as provided in this Act (Sections 1-205 and 2-208).  Whether an
> agreement has legal consequences is determined by the provisions of this Act, if
> applicable, otherwise by the law of contracts (Section 1-103). (Compare "Contract".)

28

NY UCC § 1-201(3).  Finally, "contract" is defined as "the total legal obligation which results from the parties' agreement as affected by this Act and any other applicable rules of law."  NY UCC § 1-203(11).

It is undisputed that Ms. Dickens executed a document entitled "Security Agreement" in favor of Mission Compound through which she granted that Defendant a security interest in her interest in the 100 shares of Keisler Engineering stock and that she did not execute like documents for any of the other Defendants.  There is also no dispute that, pursuant to the following section of the Uniform Commercial Code, Mission Compound's security interest in both Plaintiffs' interest in the Keisler Engineering stock is enforceable and perfected:

> (a) Attachment.  A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.

> (b) Enforceability.  Except as otherwise provided in subsections (c) through (i), a security interest is enforceable against the debtor and third parties with respect to the collateral only if:

> > (1) value has been given;

> > (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

> > (3) one of the following conditions is met:

> > > (A) the debtor has authenticated a security agreement that provides a description of the collateral . . . ; [or]

> > > . . . .

(C) the collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 8-301[[13]] pursuant to the debtor' security agreement[.]

NY UCC § 9-203.  As further explained by the Official Comments:

2. Creation, Attachment, and Enforceability.  Subsection (a) states the general rule that a security interest attaches to collateral only when it becomes enforceable against the debtor.  Subsection (b) specifies the circumstances under which a security interest becomes enforceable.  Subsection (b) states three basic prerequisites to the existence of a security interest: value (paragraph (1)), rights or power to transfer rights in collateral (paragraph (2)), and agreement plus satisfaction of an evidentiary requirement (paragraph (3)).  When all of these elements exist, a security interest becomes enforceable between the parties and attaches under subsection (a). . . .

3. Security Agreement; Authentication.  Under subsection (b)(3), enforceability requires the debtor's security agreement and compliance with an evidentiary requirement in the nature of a Statute of Frauds.  Paragraph (3)(A) represents the most basic of the evidentiary alternatives, under which the debtor must authenticate a security agreement that provides a description of the collateral.  Under Section 9-102, a "security agreement" is "an agreement that creates or provides for a security interest." . . .

4. Possession, Delivery, or Control Pursuant to Security Agreement.  The other alternatives in subsection (b)(3) dispense with the requirement of an authenticated security agreement and provide alternative evidentiary tests.  Under paragraph (3)(B), the secured party's possession substitutes for the debtor's authentication under paragraph (3)(A) if the secured party's possession is "pursuant to the debtor's security agreement."  That phrase refers to the debtor's agreement to the secured party's possession for the purpose of creating a security interest.  The phrase should not be confused with the phrase "debtor has authenticated a security agreement," used in paragraph (3)(A), which contemplates the debtor's authentication of a record.  In the unlikely event that possession is obtained without the debtor's agreement, possession would not suffice as a substitute for an authenticated security agreement.  However, once the security interest has become enforceable and has attached, it is not impaired by the fact that the secured party's possession is maintained without the agreement of a subsequent debtor (e.g., a transferee).  Possession as contemplated by Section 9-313 is possession for purposes of subsection (b)(3)(B), even though it may

---

[13] "(a) Delivery of a certificated security to a purchaser occurs when: . . . (2) another person, other than a securities intermediary, either acquires possession of the security certificate on behalf of the purchaser or, having previously acquired possession of the certificate, acknowledges that it holds for the purchaser[.]" NY UCC § 8-301(a) (2000).  Mr. Saviano testified, and the parties do not dispute, that he has held the stock certificates for both American Gear & Transmission and Keisler Engineering continuously since May 17, 2006.  *See* TRIAL EX. 328 at 90 ln. 8-19.

> not constitute possession "pursuant to the debtor's agreement" and consequently might not serve as a substitute for an authenticated security agreement under subsection (b)(3)(A).  Subsection (b)(3)(C) provides that delivery of a certificated security to the secured party under Section 8-301 pursuant to the debtor's security agreement is sufficient as a substitute for an authenticated security agreement.

NY UCC § 9-203 cmts. 2, 3, 4.  In support of their contention that each of them has a security interest in Ms. Dickens' interest in the Keisler Engineering stock, the Defendants/Counter-Plaintiffs argue that, as established by the foregoing statutes, "a security interest in certificated shares of stock in a corporation in registered form is attached, enforceable and perfected by the mere delivery by the debtor of the stock certificate to the secured party (or the agent of the secured party) without the authentication of any other writing whatsoever by the debtor." DEFS.' BR. at 9.

That Mission Compound is in possession of the Keisler Engineering stock does not negate the requirement that it be possessed as a result of having been granted a security interest therein.  In order for the Defendants to be entitled to enforce a security interest in the stock, they must actually possess such an interest.  Nevertheless, the absence of a document entitled "security agreement" from Ms. Dickens to the remaining fifteen Defendants is not fatal to the Defendants/Counter-Plaintiffs' assertion that she granted each of them a security interest in her interest in the Keisler Engineering stock.  *In re Rowe*, 369 B.R. 73, 75 (Bankr. D. Mass. 2007); *see also King v. Tuxedo Enters., Inc.*, 975 F. Supp. 448, 452 (E.D.N.Y. 1997) ("A security agreement . . . need not be embodied in a formal document."); *In re Bennett Funding Group, Inc.*, 1998 Bankr. LEXIS 1938, at *27 (Bankr. N.D.N.Y. May 6, 1998) ("Neither a grant of a security interest nor attachment depends upon whether a document formally denominated as a 'security agreement' was executed.").

31

So long as there are "documents which collectively establish an intention to grant a security interest in the collateral," a formal agreement signed by the debtor is not required. *Rowe*, 369 B.R. at 76; *see also In re Bollinger Corp.*, 614 F.2d 924, 928 (3d Cir. 1980) ("When the parties have neglected to sign a separate agreement, it would appear that the better and more practical view is to look at the transaction as a whole . . .[.]"). "A writing or writings, regardless of label, which adequately describes the collateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon would satisfy both the formal requirements of the statute and the policies behind it." *In re Numeric Corp.*, 485 F.2d 1328, 1331 (1ˢᵗ Cir. 1973). "Under New York law, the memorandum necessary to satisfy the statute of frauds need not consist of one document, it may be 'pieced together out of separate writings' not all of which need to be signed." *In re Levine's Deli & Rest., Inc.*, 53 B.R. 430, 432-33 (Bankr. S.D.N.Y. 1985) (citations omitted). Furthermore, the signed writings need not contain all essential terms of the contract, but they must clearly establish the relationship between the parties and the transaction that is the subject of the contract. *Levine's Deli & Rest.*, 53 B.R. at 433.

> Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms. The court should "construe the agreements so as to give full meaning and effect to the material provisions." A reading of the contract should not render any portion meaningless. Further, a contract should be "read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose."

*Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213-14 (N.Y. 2007) (internal citations omitted).

There was, as expected, conflicting testimony given by the Plaintiffs and the various Defendants/Counter-Plaintiffs as to their intentions concerning the Keisler Engineering stock. Ms.

Dickens testified that she was not involved in the process of purchasing the equipment from Maynards or obtaining the necessary funds for American Gear & Transmission, but instead, she simply attended the closings at Mr. Keisler's request and signed the documents he instructed her to sign without knowing any of the specifics involved.  Similarly, she testified that she signed the Side Letter Agreements dated September 1, 2006, at Mr. Keisler's request but that she did not remember any of the details contained therein.  As to the question of whether it was intended that only Mission Compound was to have a security interest in her interest in the Keisler Engineering stock, Ms. Dickens testified that she was not aware of any statement that she was only pledging her interest to Mission Compound, but that she also has not seen any "Security Agreement" which she signed for any Defendant other than Mission Compound.

During his examination, Mr. Keisler testified that Ms. Dickens was under no obligation to pledge her interest in Keisler Engineering and that she executed the Security Agreement to Mission Compound as a gesture of good will to get its help in the future.  He also testified that he believed he had pledged 100% of the American Gear & Transmission stock, a lien on his interest in the Keisler Engineering stock, and a personal guaranty as security for the subordinate loans. Additionally, Mr. Ludlam, who was an attorney at McKenna, Long, the law firm representing American Gear & Transmission in May 2006, testified in his deposition that although Ms. Dickens was to sign the Guaranty, to the best of his recollection, he had not been aware that she held any ownership interest in Keisler Engineering until the stock certificates were received the day after closing and that other than seeing the Security Agreement she had signed with respect to Mission

33

Compound, he had no other knowledge of an intent to pledge her ownership interest. TRIAL EX. 326

at 120 ln. 5-25. Nevertheless, Mr. Ludlam also testified to the following:

> Q: Are you aware of any discussions with anyone at any time that any bridge lender
> was supposed to have more collateral than any other bridge lender?
>
> A: I am going to give you a qualified no on that.
>
> No, but it was intended all along that Mission Compound would have in the sense of
> ownership and control, the stock certificates. Whether or not their rights to recover
> on that, I don't believe it was intended to be any greater or less than anyone else, it
> was merely the control and possession of that.
>
> Q: And they were maintained in that possession not only for themselves but for the
> other bridge lenders?
>
> A: Yes.
>
> Q: For perfection purposes?
>
> A: Yes.
>
> Q: Yes, sir. Are you aware of any discussions at any time with anyone about the
> need to do Kelly Dickens' security agreements for any of the bridge lenders other
> than Mission Compound?
>
> A: No.

TRIAL EX. 326 at 117 ln. 23 - 118 ln. 19.

In his deposition, when asked about his earliest recollection concerning the structure of the

funding to American Gear & Transmission, Mr. Saviano testified to the following:

> Q: What is your recollection, what is your earliest recollection, of how the transaction
> between Mission Compound and American Gear & Transmission was to be
> structured? . . .
>
> A: That Mission Compound with one or more undisclosed other lenders were going
> to make a loan which would be subordinate to bank financing, which would be
> secured and pari passu with the other subordinate lenders. That they would get a rate

of interest commensurate with the risk.  That they would have a subordinate position to the security the bank had and that they would have security in an existing company and the company that would be acquiring assets with the proceeds of the financing.

And that there would be a personal guarantee from the husband and wife, who either one or both owned the existing company, and either one or both might own the new company to be formed to purchase the equipment the financing was being sort [sic] for.

Q:  The existing company, was that Keisler Engineering, Incorporated?

A:  To my recollection, yes.

TRIAL EX. 328 at 18 ln. 12 - 19 ln. 21.  Similarly, when asked what collateral the subordinate lenders were supposed to have in addition to a subordinate lien on the assets of American Gear & Transmission, Mr. Saviano replied:

They had the personal guarantees of Shafi and Kelly Dickens and they had a security interest in first lien in Kelly Dickens and Shafi Keisler's shares in Keisler Engineering, Inc. which both Shafi and Kelly turned out having an interest in, and American Gear which only Shafi I believe had an ownership interest in.  So they had security interest first lien on 100 percent ownership in each of those two companies.

TRIAL EX. 328 at 171 ln. 16-25; *see also* 172 ln. 17-20 ("Q: Specifically, was Mission Compound supposed to have any collateral that any of the other bridge lenders did not have?  A:  Not to my knowledge.").

As for the Defendants/Counter-Plaintiffs themselves, their testimony at trial evidenced that each intended to be secured through the Keisler Engineering stock, irrespective of who owned it and that other than Mission Compound and Mr. Glazov, none of the other original six subordinate lenders – Courmont & Wapner, Dr. Hall, Mr. Hall, and Mr. Bracken – were aware that Ms. Dickens held any interest in Keisler Engineering based upon representations made by Mr. Keisler personally and in his Security Agreements with each lender.  At trial, Mr. Bracken testified that because he was

35

in a subordinate position behind BB&T, when it came to collateral, he required a security interest in the stock of both American Gear & Transmission and Keisler Engineering, as well as personal guaranties from both Plaintiffs.  He also testified that, based upon Mr. Keisler's Security Agreement which states that he owned 100% of the outstanding and issued stock, Mr. Bracken believed that Mr. Keisler was the sole interest holder in the Keisler Engineering stock.  Similarly, Mr. Goldman, a representative of Courmont & Wapner, testified that because American Gear & Transmission was a start-up company and a high risk, more collateral was required.  He also testified that because Keisler Engineering had the track record, had its stock not been pledged as collateral, Courmont & Wapner would not have been interested.  As to Ms. Dickens, Mr. Goldman testified that it was not until he received the Side Letter Agreement that he learned she held any interest in the Keisler Engineering stock and it was months after that before he learned there were issues with her pledge to the subordinate lenders of her interest in the stock.

The testimony of the remaining Defendants/Counter-Plaintiffs evidenced more of the same. Dr. Hall testified that it was his understanding that both the Plaintiffs and Keisler Engineering were guarantors, that all of the shares of both American Gear & Transmission and Keisler Engineering were pledged as collateral for the loan, and that he was unaware Ms. Dickens had any ownership interest in Keisler Engineering until he received the Side Letter Agreement dated September 1, 2006. Likewise, Mr. Hall testified that he required and understood that 100% of the stock and assets of both American Gear & Transmission and Keisler Engineering had been pledged, putting the subordinate lenders directly behind BB&T in priority, as well as the personal guaranties of both of

36

the Plaintiffs.  Mr. Hall also testified that he was told, by Mr. Keisler if he recalled correctly, that Mr. Keisler owned all of the Keisler Engineering stock, although he was not entirely sure.

With respect to Mr. Glazov, who it was stipulated knew prior to the May 16, 2006 closing that Ms. Dickens was a joint owner of the Keisler Engineering stock, he testified that he, personally, was satisfied with personal guaranties from the Plaintiffs and a pro rata security interest in 100% of the stock in both American Gear & Transmission and Keisler Engineering.  Mr. Glazov also testified that while he had questions as to why Ms. Dickens was not executing a security agreement when he saw Mr. Keisler's representations in the respective security agreements that he owned 100% of the stock, his concerns were alleviated because, since the subordinate lenders had received a pledge against 100% of the stock, it was irrelevant who actually owned the stock interests.

Section 9-102 defines a security agreement as "an agreement that creates or provides for a security interest."  Incorporating within that definition the definitions of agreement and security interest found in § 1-201(3) and (37), a security agreement is "the bargain of the parties in fact as found in their language or by implication from other circumstances that creates or provides for an interest in personal property or fixtures which secures payment or performance of an obligation."  With respect to each subordinate lender, the Plaintiffs executed a "packet" of documents that form the entire contractual agreements between the parties:  a Note Agreement, a Promissory Note, a personal Guaranty from Mr. Keisler and Ms. Dickens, a Security Agreement from American Gear & Transmission, and a Security Agreement from Mr. Keisler.  Explicit in each Note Agreement, which details the essence of the parties' relationships and was executed by both of the Plaintiffs as Pledgers, is the following covenant which states the bargain of the parties and provides for an

37

interest in the shares of stock of Keisler Engineering to secure payment of the respective Promissory

Notes issued to all Defendants:

> The Pledgers also hereby agree to guarantee payment of the Note and grant a security interest and lien in all of their shares of stock in the Borrower and in [Keisler] Engineering and AGT (if either one or both of them are not the borrower), which security interest and lien shall be a first lien on that collateral, granting to Lender the same rights, privileges and protections that BBT was given under its security agreement on the Borrower's assets and shall be in such form as Lender's attorney shall reasonably require.  The Pledgers acknowledge that they will have to give physical possession of this collateral to the Lender, which the Lender shall hold in escrow pursuant to the Security Agreement so that Lender's security interest in the collateral is perfected.  The guarantee of the Pledgers shall be joint and several with them and the Borrower.  This guarantee shall be in such form as form as [sic] Lender's attorney shall require.

TRIAL EX. 27 (Mission Compound); TRIAL EX. 34 (Courmont & Wapner); TRIAL EX. 39 (James

Hall); TRIAL EX. 44 (Glenn R. Hall and Robert Glenn Hall);[14] TRIAL EX. 49 (John Bracken); TRIAL

EX. 54 (Jordan Glazov); TRIAL EX. 68 (The Kenneth & Ellen Nibali Trust); TRIAL EX. 73 (Fundacion

Galvez); TRIAL EX. 78 (John Kerr); TRIAL EX. 83 (Tom Raymond); TRIAL EX. 88 (Donald  Tarr);

TRIAL EX. 93 (Phillip Young); TRIAL EX. 98 (George Kershaw); TRIAL EX. 103 (Clifford Johnson);[15]

TRIAL EX. 108 (Edward Drummond, Jr.); and TRIAL EX. 113 (Joe Brownlee, Jr.).  This covenant

supports the testimony of the Defendants/Counter-Plaintiffs, Mr. Ludlam, and Mr. Saviano that it

was the parties' intentions that both Plaintiffs would pledge any interest held in the stock of

American Gear & Transmission and Keisler Engineering as collateral to secure the Promissory Notes

executed in favor of the Defendants. As such, it was not necessary that Ms. Dickens execute the

Security Agreement with Mission Compound, and it is inconsequential that she did not sign separate

---

[14] *See supra* n. 4.

[15] The Clifford Johnson Note Agreement does not contain Shafi Keisler's signature but is a stipulated exhibit.

documents entitled "Security Agreement" for the remaining fifteen subordinated lenders because she granted a security interest in her interest in the shares of Keisler Engineering stock in the sixteen Note Agreements.

Additionally, although the Plaintiffs attempted to down-play the importance that the parties had agreed to pari passu treatment, by doing so, they ensured that the Defendants would be similarly situated. Black's Law Dictionary defines "pari passu" as "[b]y an equal progress; equably; ratably; without preference. Used especially of creditors who, in marshaling assets, are entitled to receive out of the same fund without any precedence over each other." BLACK'S LAW DICTIONARY 1115 (6th ed. 1994). In his deposition, Mr. Saviano explained the term as follows:

> Q: You used the term a few minutes ago, pari passu. In May of 2006, when you were drafting these documents, what did you think that the term "pari passu" meant?
>
> A: In layman's terms, sort of identical twins as attached to the hip, the shoulder and the head. Everything happens to one at the same time. You pinch one, you pinch the other. One gets happy, the other gets happy. Everyone is equal.
>
> Q: Does it have anything to do with priority?
>
> A: It had to do with when payments [were] made, they get them at the same time and they would have the same collateral and security. But of course, the amount each person would get on a note would be dependent upon how much each loaned. So the payments would be proportionate to the amount they loaned.

TRIAL EX. 328 at 130 ln. 11 - 131 ln. 5.

The Defendants' relationship to one another as subordinate lenders pari passu can be likened to a syndication loan relationship, wherein "multiple lenders loan money to the borrower and each lender has a contractual arrangement with the borrower. By contractual agreement among the lenders, one lender is designated as agent for all the lenders. The agent then has the authority to [act]

39

. . . in a representative capacity for all the lenders." *Tidwell v. Legrand (In re Amron Techs., Inc.)*, 2007 Bankr. LEXIS 1028, at *8, 2007 WL 917236, at *3 (Bankr. M.D. Ga. Mar. 22, 2007) (citing W. Crews Lott et al., *Multiple Lender Transactions: Current Issues*, 112 Banking L.J. 846, 846-47 (1995)); *see also Mizuho Corporate Bank, Ltd. v. Enron Corp. (In re Enron Corp.)*, 302 B.R. 463, 475 (Bankr. S.D.N.Y. 2003) ("In a syndication, the originating lender and the other lenders are parties to the loan agreement and each lender forms a direct relationship with the borrower.  The originating lender, which is usually appointed the lead lender, invariably seeks to limit its duties and responsibilities in the loan agreement.") (citing C. Menges, *Minimizing the Lead Lender's Liability to Co-Lenders in Syndicated Loans*, 19 No. 2 Prac. Real Est. Law. 17 (2003)); *In re Okura & Co. (Am.), Inc.*, 249 B.R. 596, 608 (Bankr. S.D.N.Y. 2000) ("One aspect of loan participation that makes them attractive is the delegation of administrative tasks . . . to a lead lender."); W.H. Knight, *Loan Participation Agreements: Catching Up With Contract Law*, Colum. Bux. L. Rev. 587, 590 (1987) ("In a syndicated loan, institutions separately extend credit to a borrower.  Usually, the loans are made under a mutual credit arrangement with one institution serving as agent for the other lenders.").

Based upon the testimony of the Defendants/Counter-Plaintiffs, as among each other, they believed and intended that none of the lenders was to have any more collateral or greater rights than any of the others.  Mr. Bracken testified that there was never any question between the subordinate lenders that they were to be on equal footing as to the collateral and that they were each to be secured by the Keisler Engineering stock equally.  Mr. Nibali testified that before he committed, he was assured by Mr. Keisler and Mr. Glazov that all of the subordinate lenders would have the same collateral and priority and that "it was critical" to him that the lead lender, Mission Compound, was

already in possession of the Keisler Engineering stock certificate. Mr. Goldman, the representative

for Courmont & Wapner, testified that none of the Defendant/Counter-Plaintiff lenders had any more

right to the Keisler Engineering stock than the others and that the decision to be pari passu facilitated

the entire deal. Dr. Hall testified that he was not aware of any conversations that one or more of the

subordinate lenders was to be more or less secured than the others. And most notably, Mr. Kurien,

the representative for Mission Compound, testified that Mission Compound had initially sought to

be a "super lender" directly behind BB&T but had given up that request in order for the other lenders

to commit, agreeing instead upon the pari passu structure which allowed for equal priority and pro

rata repayment among all of the subordinate lenders.

Finally, the court finds that Mission Compound's possession of the Keisler Engineering

stock, in its capacity and role as lead lender, is for the benefit of all the Defendant subordinate

lenders. An alleged representative of a secured party "must be able to demonstrate some source of

its authority to be deemed 'the representative of the secured party.'" *In re QuVIS, Inc*., 2010 Bankr.

LEXIS 1830, at *21, 2010 WL 2228246, at *6 (Bankr. D. Kan. June 1, 2010). In this case, the

record – including, most notably, the loan documents themselves – is replete with references not only

between the Defendants but also between the Defendants and the Plaintiffs denoting Mission

Compound as "lead lender" for the Defendants as subordinate lenders. When asked about the inter-

creditor relationship, Mr. Ludlam testified:

> A:  . . . I know that that was an issue that we were wondering about insofar as
> borrower's counsel, one of the big issues we had, we were dealing with a number of
> different lenders who were all supposed to be of equal stature. If we were going into
> this transaction without an agreement between or among those lenders that we were
> a party to, we were a little concerned about how are we going to defend multiple
> lawsuits or multiple remedy enforcement actions from the several lenders. We would

have preferred to have a single lender take the lead against us or to be able to deal with a single lender with regard to any sort of workouts or modifications subsequent thereto.

So that was an issue that we considered important.  And I don't know whether that would have been an additional provision unique to Mission Compound or anything else.

. . . .

Q:  Was there ultimately an inter-lender agreement that was done?

A:  No.  At Ed Saviano's, I don't know whether it was his request or his acceptance, we inserted a provision into the note agreement that stated effectively an inter-lender agreement, that each note agreement would have a particular provision, I think it was in the lender note agreement that said Mission Compound would act as the lead lender with regard to remedy enforcement.

Q:  What was your concept of what lead lender meant at that time?

A:  My understanding at the time was probably a couple of different approaches.

I think that my view was, we needed a single person to contact or that would be able to kind of corral all of the lenders on any sort of issue that we would have about changing payment terms down the road.

I came at it from the approach of a workout lawyer which is what I was mainly doing. I was thinking in terms of what if this goes bad or what if they want to repay but repay certain people sooner than others, how do we get people to agree to that.

I think, and you would have to ask Ed Saviano this, but I think his impression of it, and what I understood his impression of that section to mean, will be more along the lines of who is going to actually physically hold certain collateral, and that Mission Compound wanted to be the lead lender in the sense that they were actually physically having control over share certificates.

Q:  It was a physical possession issue?

A:  Yes.

TRIAL EX. 326 at 45 ln. 18 - 47 ln. 25.  With respect to Mr. Saviano, there is no dispute that he

represented Mission Compound and only Mission Compound; however, although he testified that

he did not know what responsibilities and/or powers Mission Compound has as lead lender in the

transaction, *see* Trial Ex. 328 at 103 ln. 22 - 104 ln. 24, Mr. Saviano did testify to the following:

> Q:  Was it the role of Mission Compound, acting through you as the Mission
> Compound attorney, to maintain continuous possession of the two stock certificates
> and two stock powers for all of the bridge lenders?  That would be Exhibits 1, 15, 61
> and 60.
>
> A:  I'm holding the original stock certificates and stock powers as attorney for
> Mission Compound and Mission Compound's capacity as lead lender under the
> document.

Trial Ex. 328 at 170 ln. 7-18.  This testimony was corroborated by Mr. Kurien, who testified that

although there was no separate inter-lender agreement concerning its duties and/or responsibilities,

as lead lender, Mission Compound was holding the stock certificates for itself and the other lenders

and could initiate proceedings on behalf of itself and the other lenders.  He also confirmed that Mr.

Saviano holds the stock as Mission Compound's agent.


As for the Defendants/Counter-Plaintiffs themselves, they clearly interpreted the term "lead

lender" as authorizing Mission Compound to act as their agent with respect to the American Gear

& Transmission loans.  During his testimony, Mr. Goldman testified that Courmont & Wapner relied

on Mission Compound, as lead lender, to file any necessary documents to protect the rights of all the

subordinate lenders.  Dr. Hall testified that Mission Compound was "the team leader," charged with

being the contact and holding the stock certificates for the benefit of all the subordinate lenders.  Mr.

Glazov testified that Mission Compound was the lead lender and fiduciary for all of the subordinate

lenders, having the first right to pursue remedies for default and the responsibility to hold the stock

certificates for all of their benefit.

Clearly, the Plaintiffs had the same understanding, because they acknowledged Mission Compound's lead lender status in each of the Note Agreements they executed in favor of the sixteen Defendants:

> The parties agree that Mission Compound, LLC will be the lead lender of all the Secondary Financing and that Mission Compound, LLC shall have the first right to assert the rights of all the persons making loans of the Secondary Financing (i.e., the Lender and the Other Subordinated Lenders) under the Security Agreements signed for the Secondary Financing regarding the security and the sale thereof.

TRIAL EX. 27; TRIAL EX. 34; TRIAL EX. 39; TRIAL EX. 44; TRIAL EX. 49; TRIAL EX. 54; TRIAL EX. 68; TRIAL EX. 73; TRIAL EX. 78; TRIAL EX. 83; TRIAL EX. 88; TRIAL EX. 93; TRIAL EX. 98; TRIAL EX. 103; TRIAL EX. 108; TRIAL EX. 113.

In summary, the court finds that, as security for the loans to American Gear & Transmission, Ms. Dickens pledged her interest in the Keisler Engineering stock not only to Mission Compound but also to the eight Defendants/Counter-Plaintiffs and the eight Defaulted Defendants. The court also finds that Mission Compound, in its role and capacity as lead lender in the pari passu structure chosen by the subordinate lenders, holds possession of the Keisler Engineering stock certificate for the benefit of each of the foregoing sixteen Defendants. Finally, the court finds that the claims of the Defendants/Counter-Plaintiffs secured by the Keisler Engineering stock are as follows:

| | |
|---|---|
| John Bracken | $279,480.75 |
| James Hall | $349,368.40 |
| Dr. R. Glenn Hall | $116,466.80 |
| Jordan E. Glazov | $182,661.49 |
| Courmont & Wapner Associates | $582,270.04 |
| Mission Compound | $582,270.04 |
| Kenneth and Ellen Nibali Trust | $232,892.16 |
| Fundacion Galvez | $116,466.80 |

A judgment will be entered fixing the amounts of the claims of the eight Defendants/Counter-Plaintiffs as of September 29, 2008, as set forth above, determining that all sixteen Defendants have a security interest in the Plaintiff Kelly Dickens' ownership interest in the 100 shares of Keisler Engineering stock, and dismissing the Plaintiffs' action as to the Defendant Sheila Glazov. Additionally, a scheduling conference will be set to fix a trial date for any unresolved issues, including the valuation of the Keisler Engineering stock.

FILED: November 4, 2010

BY THE COURT

*/s/ RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE

45